UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HRT ENTERPRISES,

     Plaintiff,

vs.                                                                          Case No. 12-13710

CITY OF DETROIT,                                                HON. AVERN COHN

     Defendants.

_____/

**DECISION AND ORDER DENYING DEFENDANT'S
MOTION TO DISMISS, OR, IN THE ALTERNATIVE,
<u>FOR SUMMARY JUDGMENT (Doc. 9)</u>**

## I. INTRODUCTION

This is a Fifth Amendment takings case.  Plaintiff HRT Enterprises (HRT) owns an 11-acre parcel of land with a commercial building having a footprint of approximately four acres (the property) directly across French Road from the Coleman A. Young International Airport, formerly the Detroit City Airport (Airport), in the City of Detroit.  HRT's property is configured, and has been operated, as a steel service center.  According to HRT, a "filed and approved" Airport Layout Plan shows that the parcel is at the center of the Airport and is designated for a taking by the City along with other properties in a "Mini-Take Area."

HRT complains that defendant City of Detroit (the City) has engaged in an inverse condemnation by delaying acquisition of the property and taking certain actions in an attempt to drive down the amount of compensation it will have to pay HRT.  The actions include passing resolutions that declare the necessity of acquiring the properties by condemnation; isolating the Mini-Take Area by closing McNichols Road between Conner

and French; and systematically publishing plans to acquire the properties leading to "blight by announcement."

The complaint is in four counts:

(I)     Inverse Condemnation - <u>De Facto</u> Taking;
(II)    Inverse Condemnation - City of Detroit's Unreasonable Delay in Acquiring Property;
(III)   Inverse Condemnation - Regulatory Taking; and
(IV)    Substantive Due Process.

Now before the Court is the City's motion to dismiss, or, in the alternative, motion for summary judgment (Doc. 9). For the reasons that follow, the motion is DENIED.

## II. BACKGROUND[1]

### A.

Due to the City's acquisition efforts in the Mini-Take Area, on September 3, 1999, Merkur Steel Supply, Inc. (Merkur Steel), one of HRT's tenants, filed a takings claim against the City in Wayne County Circuit Court (Doc. 11, p. 4). In 2002, a jury entered a verdict in favor of Merkur Steel, finding that the City's acquisition efforts amounted to a <u>de facto</u> taking of Merkur Steel's leasehold interest in the property (<u>Id.</u> at 4-5). Merkur Steel's sub-tenant Steel Associates, Inc. (Steel Associates) filed a separate action in Wayne County Circuit Court against the City claiming a <u>de facto</u> taking of its leasehold interest (<u>Id.</u> at 5). In 2003, a jury verdict was entered in favor of Steel Associates (<u>Id.</u>).

Subsequently Merkur Steel, Steel Associates and HRT collectively filed suit against the City in Wayne County Circuit Court claiming inverse condemnation of the property (<u>Id.</u>

---

[1] The parties did not submit a joint statement of undisputed material facts. Defendant filed a statement of material facts not in dispute; plaintiff responded; defendant filed a response to plaintiff's counter-statement of facts.

at 6).  In addition to the claims raised in this case, HRT stated a procedural due process claim and an equal protection claim under the Michigan Constitution.  In 2005, a jury returned a verdict of no cause of action, rejecting HRT's claim of inverse condemnation (Id. at 6-7).  In 2007, the Michigan Court of Appeals affirmed the jury verdict, and, in 2008, the Michigan Supreme Court denied leave to appeal (Id. at 6-7).

In 2008, HRT filed a four-count complaint in this Court, similar to the current complaint.  See HRT Enters. v. City of Detroit, No. 08-14460 (E.D. Mich. 2008).  The Court found that the operative facts had changed from those presented to the 2005 state jury. In 2005, part of the property was still occupied and generating enough revenue from rent to pay taxes and perform repairs to the property.  By 2008, according to HRT, the property was vacant and there was no longer enough rental income to pay taxes or maintain the property.  However, the Court held that HRT had not sought just compensation through state procedures based on the new facts, and, therefore, the case was not ripe for federal court review under Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 195-97 (1985).

In 2009, HRT filed another complaint in state court claiming inverse condemnation of its property (Doc. 11, p. 8).  The trial court dismissed HRT's claims based on res judicata; in 2012, the Michigan Court of Appeals affirmed the trial court's decision.  See HRT Enters. v. City of Detroit, No. 09-016475-CC, 2012 WL 3055221 (Mich. Ct. App. 2012).  The court of appeals reasoned that HRT did not raise any new facts from the time of the 2005 jury trial.  Id.  HRT did not seek leave to appeal the Michigan Supreme Court.

**B.**

On August 21, 2012, HRT filed this action (Doc. 1).  HRT says the facts have

3

changed since 2005 and the City's subsequent actions have amounted to a total taking of the property.  HRT says the following events have occurred since 2005:

1. The last remaining tenant on the property went out of business in late 2008 and the property is now vacant;

2. The property has been looted by vandals who used adjacent City owned land to gain access to the property.  Further, the City is not maintaining the land it owns in the area, and it is being used as a dumping ground;

3. HRT has been unable to lease or sell the property.  The City, however, says that it technically leases the property because it is paying rent to HRT;

4. In December of 2006, Delbert Brown (Brown), manager of the Airport, confirmed the City's plan to construct a replacement runway, which requires meeting FAA airport facility standards;

5. In March of 2008, former City Mayor Kwame Kilpatrick stated that the City would complete the acquisition of land near the Airport along French Road;

6. In October of 2008, Brown, in a letter to the City Council's Public Health and Safety Standing Committee, stated that the Airport "will continue the land acquisition program to facilitate safety areas, clear zones and ultimately the replacement of the existing runway";

7. In March of 2010, the City's Purchasing Division informed the public that it intended to acquire all of the property necessary for building a replacement runway;

8. In October of 2008, Brown recommended to City Council against the reopening of McNichols Road, which was approved to be closed for five years in 1987;

9. The City has continued to purchase both residential and commercial properties

4

within, and outside of, the Mini-Take Area since 2005;

10. In February of 2007, the City entered into a grant agreement for another airport project and accepted state and federal funds for land acquisition;

11. In January of 2008, the City submitted to the FAA a proposal for funding to completely close French Road, the road on which HRT's property is located, between Lynch and McNichols;

12. In 2008, the City requested $85 million in funding from the FAA to expand the airport;

13. In 2009, the City constructed a left turn lane off of French Road, which leads to HRT's vacant property; and

14. In July of 2011, HRT hired Gilbert's Trucking to construct an earthen berm on the property to prevent trespassing.  The City arrested and prosecuted employees of Gilbert's Trucking for trespassing on City owned property.  Thus, the City has held itself out to the public as owner of HRT's land.

See (Doc. 11, pp. 18-27).

Since the 2005 jury trial, the City has also received a number of federal grants through the "Michigan Department of Transportation City of Detroit Contract for a Federal/State/Local Airport Project Under the Block Grant Program."  The grants were awarded as follows:

1. On December 1, 2005, the City received a grant to "Conduct an Economic Impact Study, as Further Defined in Contract No. FM 82-02-MP."

2. On February 9, 2007, the City received a grant for "Land Reimbursement Costs for Parcels 392, 488, 491, 511, 626, 710, 711, 715, 731, 732, 939, 940, 943, 956, 958, 959,

960, and 961, as Further Defined in Contract No. FM 82-02-LAND."

3. On December 3, 2007, the City received a grant for "Airport Crack Sealing and Paint Marking, as Further Defined in Contract No. FM 82-02-C84."

4. On March 3, 2008, the City received a grant for "Land Acquisition Costs for Parcels 1613, 1618, 1630, 1640, 1539, 1540, 1541, 1542, 1290, 1292, 1293, 1294, 1416, 1417, 1418, 1419, 1425, 1430, 1433, 1434, 1505, 1508, 1513, 1514, 1515, 1516, 1517, 139, 245, 246, 252, 355, 486, 487, 937 and 938 as Further Defined in Contract No. FM 82-02-LAND."

5. On June 10, 2008, the City received a grant for "Reconfiguration of the Taxiway at Runway 25 (End) and Update of the Airport Layout Plan, as Further Defined in Contract Nos. FM 82-02-C85 and FM 82-02-MP."

6. On February 1, 2010, the City received a grant for "Design and construction of a hanger to house a Michigan State Police (MSP) helicopter, as further defined in Contract No. M 82-02-C86."

7. On April 28, 2011, the City received a grant for "Design for the Rehabilitation of Parallel Taxiway A.  Design and Construction for the Reconfiguration of the Taxiway Connectors at Runway 25 End.  This Work is Further Defined in Contract Nos. FM 82-02-C85 and FM 82-02-C87.

8. On August 12, 2011, the City received a grant to "Rehabilitate Parallel Taxiway A for Runway 15/33."

9. On March 2, 2012 the grant for the rehabilitation of parallel taxiway A for runway 15/33 was amended.

Further, following the 2005 jury trial, the City has systematically continued to

6

purchase property in the Mini-Take Area.  The City submitted to the Court a document that shows that it has purchased fifty-eight parcels from January of 2005 until the present time.

Although HRT has not sought to obtain a permit to rehabilitate or expand its building, at a hearing on January 16, 2013, the City admitted that a portion of the property is not suitable for building because it would be in violation of the "building restriction line," which restricts buildings from being too close to the runway.  Further, the City admitted that certain changes would not be permitted because they would interfere with the (1) "runway visibility zone," or (2) "transitional zone."  The airport has two runways that are perpendicular to each other.  The runway visibility zone is the area where a pilot on one runway needs to be able to see a plane on the other runway.  The transitional zone is the area around the runway, which must be clear in case a plane deviates from the flight path or the runway.  Further, transforming the building from a steel service center to another use would require compliance with FAA regulations, Michigan's Tall Structure Permit Act and likely face Detroit Building Department opposition.

The City's Airport Layout Plan[2] (the Plan) shows that the building restriction line for existing runways 15-33 and 7-25 runs directly through a portion of the property.  See Pl's. Ex. 18.  Further, the Plan proposes a new runway which runs through the property.  See Pl's. Ex. 19.  A new preliminary plan, submitted to the FAA and the State of Michigan in January of 2009, also shows a new runway going through the property.  See Pl's. Ex. 20.

More recently, on January 9, 2013, the City released its "Detroit Future City Report"

---

[2] The current approved Airport Layout Plan is the City's 1996 plan.

(DFC Report) (Doc. 15, p. 1)[3].  The DFC Report contains recommendations for different

areas and neighborhoods in the City (Doc. 17, p. 7).  In the DFC Report, the property is

located in the designated "Mt. Elliott Industrial" neighborhood (Doc. 15, p. 1).  The DFC

Report states, in pertinent part:

> The vision is to upgrade Mt. Elliott as an intense and attractive
> industrial area designed to accommodate modern, large-format
> industrial development; provide ample employment
> opportunities for Detroiters; and reinforce the region's role as
> a global hub for manufacturing.  Expansion of the Coleman A.
> Young Airport will serve to support the local auto and metals
> industries but also provide additional opportunities in
> aerospace activities that align with many skills already in place
> to serve auto production.  A new ring-road will connect this
> district directly with Chrysler to the south along with logistics
> activities, the Port, and the international crossing in Southwest
> Detroit.

(Doc. 15-2).

## III. STANDARD OF REVIEW

### A. Fed. R. Civ. P. 12(b)(6)

A Fed. R. Civ. P. 12(b)(6) motion seeks dismissal for a plaintiff's failure to state a

claim upon which relief can be granted.  In reviewing a motion to dismiss, "the court must

construe the complaint in the light most favorable to the plaintiff, accept all the factual

allegations as true, and determine whether the plaintiff can prove a set of facts in support

of its claims that would entitle it to relief."  Bovee v. Coopers & Lybrand C.P.A., 272 F.3d

356, 360 (6th Cir. 2001).  The court is not required to accept as true legal conclusions,

conclusory statements, or mere recitations of the elements of a cause of action.  Ashcroft

---

[3] The DFC Report was created by a Mayor-appointed Steering Committee and the
Detroit Economic Growth Corporation (Doc. 17, p. 7).

8

v. Iqbal, 556 U.S. 662, 677 (2009).  Indeed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678 (citation omitted).

"To survive a motion to dismiss under Rule 12(b)(6), a 'complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'"  Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n., 176 F.3d 315, 319 (6th Cir. 1999) (quoting Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)).  The plaintiff must "state a claim for relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief."  Fabian v. Fuller Helmets, Inc., 628 F.3d 278, 280 (6th Cir. 2010) (citing Iqbal, 556 U.S. at 677).  The Court must "draw on its judicial experience and common sense" in determining whether a claim is plausible.  Iqbal, 556 U.S. at 679.

### B. Fed. R. Civ. P. 56

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set out specific facts showing a genuine issue for trial.  Chappell v. City of Cleveland, 585 F.3d 901, 906 (6th Cir. 2009).  The Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party."  Hawkins

v. Anheuser-Busch, Inc., 517 F.3d 321, 332 (6th Cir. 2008).   Determining credibility,

weighing evidence, and drawing reasonable inferences are left to the trier of fact.   See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## IV. DISCUSSION

The City says it is entitled to dismissal, or, in the alternative, summary judgment, for

four reasons:

> First, HRT has failed to exhaust state court remedies.  Despite
> this Court's admonitions, HRT did not file an Application for
> Leave to appeal with the Michigan Supreme Court following the
> Michigan Court of Appeals' July 2012 decision.  Second, under
> Michigan law, res judicata and collateral estoppel law bar this
> case because prior courts actually decided the inverse
> condemnation claims and issues as the Michigan Court of
> Appeals held.   Third, under 28 U.S.C. § 1738, the prior
> Michigan court decisions preclude this current action.   As
> illustrated in San Remo Hotel, L.P. v. City of San Francisco,
> 545 U.S. 323 (2005) a federal court is precluded from
> relitigating claims that would be precluded under the relevant
> state's law.  Finally, HRT's claims are barred by the applicable
> statute of limitations.  Indeed, HRT's takings claims accrued in
> 1991.

(Doc. 9, p. 1-2).  The City's arguments fail to persuade.  The reasons follow.

## A. Ripeness

The City first claims that this case is not ripe for federal court review because HRT

did not file an application for leave to appeal with the Michigan Supreme Court following the

2012 decision of the Michigan Court of Appeals described at page 3, supra.  HRT did not

claim that an application for leave to appeal to the Michigan Supreme Court would be futile.

Therefore, the City says that HRT did not exhaust state court remedies.  The City is

mistaken.

In Williamson County, the Supreme Court held that a takings claim is not ripe until

10

a two-prong test is satisfied: (1) an administrative body has rendered a final decision, i.e. the "finality" requirement; and (2) the property owner resorted to state remedies for just compensation, i.e. pursued an inverse condemnation action.  473 U.S. 172.  The second prong is at issue here.

As it relates to the second prong, the Supreme Court stated, "[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation."  Id. at 195.  The Michigan Constitution provides that a property owner can seek compensation by filing an action for inverse condemnation when property is taken for public use.  Mich. Const. Art. 10, § 2.

Here, HRT's claim is ripe.  HRT pursued an inverse condemnation claim to an unsuccessful conclusion in state court.  HRT argued its case in the state trial court and in the Michigan Court of Appeals.  It exhausted its appeal by right.  The time for applying for review by the Michigan Supreme Court has expired.  The City does not provide any authority for its position that HRT's failure to file for review by the Michigan Supreme Court precludes it forever from asserting a takings claim in federal court.  To the contrary, Williamson County precluded a plaintiff from bringing a takings claim until it has been denied just compensation.  Here, after the court of appeals' decision became final, HRT was denied just compensation through adequate state procedure, and its claim immediately became ripe for review by this Court.  See, e.g., Brown v. Metro. Gov't of Nashville, No.11-5339, 2012 WL 2861593, at *3 (6th Cir. Jan. 9, 2012) (reasoning that takings claim was ripe for review after plaintiff had pursued an inverse condemnation action in state court, receiving final decision by state court of appeals, but not appealing that decision to the

11

state supreme court).

## B. Res Judicata/Collateral Estoppel

Next, the City says that HRT has already had its bite at the apple in state court, and the case must be dismissed either on res judicata grounds, or under 28 U.S.C. § 1738. The Court disagrees. The 2008 case was not decided on the merits. The trial court ruled on the 2005 adjudication. Indeed, the trial court explicitly stated that "this case has already been litigated once. The jury entered a no-cause of action in HRT versus City of Detroit, in the 2005 case. This issue has already been decided." The trial court did not consider what occurred since 2005.

Under the full faith and credit statute, 28 U.S.C. § 1738, a federal court must give preclusive effect to prior state court actions according to the preclusion law of the state. San Remo Hotel, L.P. v. City and Cnty. Of San Fran., Cal., 545 U.S. 323, 336 (2005) ("This statute has long been understood to encompass the doctrines of res judicata, or 'claim preclusion,' and collateral estoppel, or 'issue preclusion.' "); DLX, Inc. v. Kentucky, 381 F.3d 511, 520 (6th Cir. 2004) ("[P]reclusive effect must be given to . . . prior state-court action[s] under 28 U.S.C. [§] 1738 according to res judicata law of the state.").

The Michigan Supreme Court has recognized that "[t]he doctrine of res judicata bars a subsequent action when '(1) the first action was decided on the merits, (2) the matter contested in the second action was or could have been resolved in the first, and (3) both actions involve the same parties or their privies." Estes v. Titus, 481 Mich. 573, 585 (2008). Michigan takes a broad approach to the doctrine of res judicata, "holding that it bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." Adair v. State, 470

12

Mich. 105, 121 (2004) (citing <u>Dart v. Dart.</u>, 460 Mich. 573, 586 (1999)).  Relatedly, the doctrine of collateral estoppel bars subsequent claims where "(1) a question of fact essential to the judgment was actually litigated and determined by a valid and final judgment, (2) the same parties had a full and fair opportunity to litigate the issue, and (3) there was mutuality of estoppel." <u>Id.</u> (citation omitted).

Here, the Michigan state courts held that HRT's claim was barred by res judicata. That was not a decision on the merits entitled to preclusive effect.  Further, because of the many events that occurred <u>after</u> the 2005 trial, as detailed above, HRT did not have an opportunity to resolve its claim in the first case.  It could not have presented facts not yet in existence at the time of the 2005 case.  These additional facts might lead a jury to conclude that today, in 2013, a taking of HRT's property has occurred.  The Michigan Court of Appeals, with little explanation, decided that HRT did not present new facts since the 2005 jury verdict.  The Michigan Court of Appeals categorized the "new facts" as being of the same nature as the facts presented to the 2005 jury.  The evidence belies this assertion, and the Court is not bound by the Michigan Court of Appeals' decision.  Res judicata and collateral estoppel do not bar HRT's suit.

### C. Statute of Limitations

Next, the City says that the statute of limitations bars HRT's claims.  The parties agree that a fifteen-year statute of limitations applies where, as here, HRT holds a present ownership in the property at the time the lawsuit was filed.  Mich. Comp. Laws § 600.5801(4).  The City says that HRT's claim is barred because it accrued in 1991, when the City first discussed its expansion plans.  The City is mistaken.

This case is based on the events that occurred subsequent to the 2005 trial.

13

Although HRT's underlying claim is based on the City's expansion plans, the statute of limitations began to run when HRT's claim accrued.  In 2005, a jury determined that HRT did not have a claim.  Based on the City's continuing actions subsequent to the 2005 trial, however, it is possible that a jury will find that a taking has now occurred eight years later. HRT's claim is based on the City's actions since 2005, which are continuing to date.  At the earliest, the statute of limitations began to run in 2005.  This action is timely.

## V. CONCLUSION

For the reasons stated above, the City's motion to dismiss and/or for summary judgment (Doc. 9) is DENIED.  The overwhelming additional events that have occurred since 2005, when a state court jury determined that HRT did not have a takings claim, present a question of fact as to whether a taking has now occurred.  The City has continued its acquisition efforts in the Mini-Take Area for eight years since the 2005 jury trial.  There is an abundance of facts of which a jury may now find amount to a taking of HRT's property.

SO ORDERED.

 S/Avern Cohn                                   
UNITED STATES DISTRICT JUDGE


Dated:  March 26, 2013


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, March 26, 2013, by electronic and/or ordinary mail.

 S/Sakne Chami                      
Case Manager, (313) 234-5160

14