UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HRT ENTERPRISES,

                    Plaintiff,                  Case Number 12-13710

v.                                       Honorable David M. Lawson

CITY OF DETROIT,

                    Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO ALTER OR AMEND JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR RECONSIDERATION OF ORDER DENYING PREJUDGMENT INTEREST

After a jury returned a verdict of $4.25 million in favor of the plaintiff HRT Enterprises in this inverse condemnation case and determined that the City of Detroit's actions amounted to a taking of its property as of January 1, 2009, this Court's predecessor, the Honorable Avern Cohn, granted a remittitur to $2 million, which the plaintiff refused. A second jury again ruled in favor of the plaintiff but awarded damages of $1,976,820. The Court subsequently denied the plaintiff's request for prejudgment interest. Judgment was entered. The defendant now moves to amend the judgment under Federal Rule of Civil Procedure 59(e) to award damages of $0. The plaintiff has filed a motion asking the Court to reconsider its denial of prejudgment interest. The Court heard oral argument on June 28, 2023. There is no basis to set off the jury's award of compensation in this case against previous taking awards to nonparties that had a relationship to the condemned property, nor are there any other grounds to amend the judgment award. However, the Court did not decide the prejudgment interest issue properly, and the plaintiff has stated a meritorious basis for reconsideration. The motion to alter or amend the judgment will be denied, and the motion for reconsideration will be granted.

I.

The parties are familiar with the long and complicated factual history of this dispute, and it has been summarized in previous opinions of the Court. *See HRT Enterprises v. City of Detroit*, No. 12-13710, 2022 WL 3142959 (E.D. Mich. Aug. 5, 2022); *HRT Enterprises v. City of Detroit*, 524 F. Supp. 3d 713, 715 (E.D. Mich. 2021). Some of those facts are repeated here for convenience.

This dispute over the City of Detroit's regulatory taking of the plaintiff's airport-adjacent industrial property has been pending in this Court since August 2012. The plaintiff's parcels situated at 11111 and 11181 French Road, Detroit, Michigan sometimes have figured in the City's on-again-off-again plans to expand or improve Detroit City Airport, now known as the Coleman A. Young International Airport.

HRT's property is a commercial parcel adjacent to French Road, which separates it from the airport proper. At one time, it contained a 188,000-square-foot building that operated as a steel service center. The front of the building is approximately 525 feet away from and on the centerline of the airport's existing Runway 15/33. Although portions of the building have been demolished, the remaining portion of the building, consisting of office space, is within the FAA's standard building restriction line. Since 1972, the FAA has granted design waivers, allowing the airport to operate with a smaller safety area than FAA standards require. The waivers were renewed in 1988, but the City was expected to take appropriate action by mitigating these airport hazards. The City proposed to acquire properties and eliminate structures to clear an area 750 feet from the existing runway centerline when it acquired FAA funds to do so.

The City's plans for the airport, and their effect on the viability of HRT's property for commercial use, have spawned multiple lawsuits in state court and this Court. The City never

formally condemned HRT's property under its eminent domain power, although it condemned or otherwise acquired other land in the airport vicinity in its so-called "Mini-Take Area." In 1996, the City filed with the FAA and the State the Airport Layout Plan. The plan detailed the expansion of the airport, including plans for a new runway. The City relied on the plan to request federal funding. However, by 2005, the airport expansion had not occurred, nor was funding forthcoming for acquisition of the property. Since 2005, the City has acquired approximately a third of the residential properties within the Mini-Take Area. Additionally, the airport owns approximately another third. All of the remaining residential property in the Mini-Take Area is either owned or is being acquired by the City through federal funding.

Another plan was drafted in 2009 in contemplation of a larger expansion of the airport than the 1996 plan. The 2009 plan designates the HRT property for acquisition. If the airport were expanded as contemplated in the 2009 Plan, Lynch and French Road would no longer exist. In addition, the 2009 Plan called for a new runway and a new taxiway that would pass directly through HRT's property. The 2009 Plan would have required the City to acquire that property, but the 2009 Plan was not an official plan. As of 2015, the only approved Airport Layout Plan on file with the FAA and the State was the 1996 Plan.

The City's acquisition policies spawned other litigation over the property.

Each of HRT's two tenants filed a lawsuit alleging inverse condemnation of their leasehold interests. Merkur Steel filed a taking suit against the City in the Wayne County, Michigan circuit court in September 1999. That suit resulted in a jury verdict in favor of Merkur Steel concluding that the City's acquisition efforts amounted to a *de facto* taking of Merkur Steel's leasehold interest in the property. The Michigan Court of Appeals affirmed that determination and the $6.8 million compensation award. *See Merkur Steel Supply Inc. v. City of Detroit*, 261 Mich. App. 116, 680

N.W.2d 485 (2004). Merkur Steel's sub-tenant Steel Associates, Inc. filed a separate action in the Wayne County circuit court against the City also alleging a *de facto* taking of its leasehold interest. In 2003, a jury found in favor of Steel Associates and awarded $4 million in compensation. The court of appeals affirmed in a 2005 decision. *See Steel Associates, Inc. v. City of Detroit*, No. 254025, 2005 WL 2656648 (Mich. Ct. App. Oct. 18, 2005).

Subsequently in 2005, Merkur Steel, Steel Associates, and HRT collectively filed suit in Wayne County circuit court against the City for inverse condemnation. The parties alleged "that the filing of the airport layout plan and the threat of potential condemnation of the property affected its property so adversely as to amount to [a] taking without just compensation." *HRT Enterprises v. City of Detroit*, No. 268285, 2007 WL 2118867, at *1 (Mich. Ct. App. July 24, 2007). HRT proceeded to trial on its own, and in 2005 a jury returned no-cause-of-action verdict in favor of the City. The state court of appeals affirmed, stating that there was "competent evidence to support a finding that the [C]ity's actions were not a substantial cause of the decline of HRT's property and that the [C]ity did not abuse its legitimate powers in affirmative actions directly aimed at HRT's property." *Id*. at *7. The Michigan Supreme Court denied leave to appeal. *HRT Enters. v. City of Detroit*, 480 Mich. 1134 (2008). The City here attributes the apparently inconsistent verdicts to bad lawyering on its part.

Next, HRT sued the City for inverse condemnation in this Court in 2008 based on additional events that occurred since the 2005 trial. *HRT Enters. v. City of Detroit*, No. 08-14460 (E.D. Mich. 2008). Judge Cohn dismissed that case without prejudice, finding that because HRT did not seek compensation through state procedures based on the new facts, the case was unripe for federal review under *Williamson County Regional Planning Commission v. Hamilton Bank of*

*Johnson City*, 473 U.S. 172, 195-97 (1985), *overruled by Kinck v. Twp. of Scott, Pa.*, --- U.S. ---, 139 S. Ct 2162 (2019).

Undaunted, HRT returned to state court in 2009 and again sued the City for inverse condemnation. The trial court dismissed that case based on *res judicata*, and the Michigan Court of Appeals affirmed the dismissal. *HRT Enters. v. City of Detroit*, No. 09-016475-CC, 2012 WL 3055221 (Mich. Ct. App. July 26, 2012). HRT did not seek leave to appeal to the Michigan Supreme Court.

All of that set the stage for the present lawsuit, which HRT filed in 2012, alleging inverse condemnation based on events that occurred since the 2005 jury verdict in state court. The City filed a motion to dismiss, or alternatively for summary judgment, pressing a *res judicata* argument based on the 2005 state court verdict in its favor and the dismissal of the 2009 state court case on the same grounds. Judge Cohn denied that motion, concluding that additional events that had occurred since 2005 would permit a new jury to find a taking of the property.

HRT then filed its motion for partial summary judgment on liability, arguing that because the property lies inside the airport's building restriction line and runway visibility line, it has been deprived of all economically viable use of the property and is entitled to compensation. Judge Cohn held a hearing in May 2015 and heard testimony from two witnesses proffered by the City. The first witness was Michael Borta, the airport's Chief Consultant for planning, design, and construction engineering services. The second witness, Jason Watts, was the director of the airport. These witnesses established that:

(1) HRT's property lies outside the FAA-waived building-restriction line. However, if the airport is to meet FAA standards, the airport's primary surface will extend to the property line, and the building-restriction zone will extend approximately one-third into the eastern boundary of the property. At the building-restriction line, a building cannot be constructed higher than 35 feet. Further, as the distance from the runway decreases, the allowable

height decreases at a set rate. Watt testified that HRT would be "very limited" in its ability to use its property within the standard building restriction line.

(2) The City has been acquiring property within the Mini-Take Area in order to cure the technical violations that form the basis for the FAA waivers.  Currently, all of the residential property in the Mini-Take Area is either owned or being acquired by the City.  Although the City initially paid for these acquisitions, the FAA has generally reimbursed the City what it paid out.

(3) The property was not included in the Mini-Take Area because the FAA instructed the City to acquire residential properties before commercial properties.  The City has submitted to the FAA an Airport Capital Improvement Plan, which includes requests to the FAA for funds to acquire the property.  These requests were "continually rejected."  Nonetheless, the same building restrictions applied to the property as to the residential properties within the Mini-Take Area.  Other than the HRT property, the only commercial property outside the Mini Take Area — and therefore not planned for acquisition by the City — are the two parcels to the south of HRT, owned by Chrysler and MichCon.

(4) In 2010, the Capital Improvement Plan was revised to delete any funding requests for a replacement runway.  The current Capital Improvement Plan is therefore geared toward rehabilitation of the existing runway and physical plant, rather than toward a replacement runway.

(5) Contrary to recently published newspaper articles, the City has not acquired — nor had it requested funding from the FAA to acquire — land necessary to build the new runway.  Nor is it the City's intention to build a new runway at the airport at this time.  Instead, FAA funds have been used to upgrade the existing airport facilities and for reimbursement from Mini-Take acquisitions.

The case originally was assigned to Judge Cohn, who entertained multiple rounds of dispositive motions on the factual and legal issues presented by the case.  In August 2015, Judge Cohn granted HRT's summary judgment motion on the issue of a taking, finding that the City had inversely condemned the parcel and stating that the issue of damages would proceed to trial.  ECF No. 63.  In addition, the jury would also have to determine the date of the taking.  The City moved for reconsideration.  The Court ordered HRT to respond, and after the Court allowed more discovery and the parties submitted several rounds of supplemental briefing, Judge Cohn denied the motion.  ECF No. 94.  The City asked the Court to certify the case for an interlocutory appeal under 28 U.S.C. § 1292, and the Court granted that motion, specifically targeting the partial

summary judgment on liability.  ECF No. 132.  However, the court of appeals denied the City's motion for permission to appeal, unconvinced "that there is a substantial ground for a difference of opinion as to the district court's ruling."  ECF No. 133.

The case proceeded to a jury trial, and on April 24, 2019, the jury returned a verdict establishing the date of the taking as January 1, 2009 and the fair market value of the property on that date as $4.25 million.  However, on October 30, 2019, Judge Cohn granted a remittitur of the verdict and reduced the judgment to $2 million, after he found that the testimony presented at trial was not adequate to prove a higher valuation.  The plaintiff filed a notice of its rejection of the remittitur on November 25, 2019.  On the following day, Judge Cohn issued an order setting aside the verdict and granting a new trial "on the issue of damages."

On January 13, 2020, the case was reassigned to the undersigned.  The City was permitted to file a "motion for reconsideration" in which it sought to reopen the issue of liability for the taking.  HRT filed a motion to certify the remittitur decision for interlocutory appeal.  On March 10, 2021, the Court issued an opinion denying both motions.

In March 2022, after the federal courthouse reopened and in-person civil jury trials were resumed, the case was set for trial on August 24, 2022.  The parties filed numerous motions *in limine*, and a final pretrial conference was scheduled for August 9, 2022.

On July 13, 2022, on the eve of trial, and a decade into the protracted litigation, the City filed a "motion to dismiss for lack of subject matter jurisdiction" under Federal Rule of Civil Procedure 12(b)(1).  That motion to dismiss was denied on August 5, 2022.

The second jury trial began on August 24, 2022.  After the plaintiff rested, the City indicated that it would not call any witnesses and immediately rested its case.  The Court then entertained an oral motion for a judgment as a matter of law under Federal Rule of Civil Procedure

50(a).  In its oral motion, the City argued two points, (1) that there was no competent evidence to establish the fair market value of the property as to January 9, 2009, and (2) that as a matter of law any "fixtures" that existed on the property were owned by the tenants and not HRT, and therefore HRT was not entitled to recover any part of the value of any such "fixtures."  *See* Trial Tr. Vol III, ECF No. 435, PageID.11702-03 ("[W]e would ask for a directed verdict as to the fair market value as being nothing, because Mr. Thomas's testimony cannot be relied on as to value. It's from 0 to $6 million to 132,000.  No reasonable jury could rely on him for valuation."); *id.* at PageID.11702 ("The lease is very clear, the trade fixtures, the things that were put in, the 60-inch or 60,000-ton steel slitter that was put in, all of those trade fixtures were only ever the property of the tenants. And we know very clearly that HRT is the landlord, not the tenant. And at the last moment we heard the testimony that that lease persists as of today. There is no ownership by HRT as to the fixtures, so we would move for a directed verdict [that] there is no value of the trade fixtures to be assigned to HRT in this case.").  The Court summarily denied the portion of the motion arguing that there was no competent evidence of market value for the property.  *Id.* at PageID.11703 ("With respect, on the second motion, there is sufficient evidence to permit the jury to make an evaluation of fair market value, so with due respect, that's denied.").  However, the Court took under advisement the motion relating to the fixtures and advised the City that it would be permitted to renew that portion of the motion after the verdict was returned.  *Id.* at PageID.11705 ("All right. Well, that's — the question of what 'movable' modifies, I think, is really at the crux of the motion here, because otherwise it would be a slam dunk one way or the other.  It is ambiguous.  I will take the motion under advisement, however, and permit the jury to consider the question of fixtures, and you may renew that motion after the verdict if you choose.").  The Court also agreed with the City's request for a verdict form that isolated the question of compensation for fixtures.

-8-

On August 26, 2022, the second jury trial concluded with a verdict determining just compensation for the value of "land and buildings" taken in the amount of $1,976,820. However, the jury awarded $0 for the value of "fixtures" associated with the property. *See* Verdict, ECF No. 428. The Court determined that before it could enter judgment on the verdict, it would need to decide whether the plaintiff could recover prejudgment interest. The Court therefore directed the parties to submit post-trial supplemental briefs "stating their positions on whether the plaintiff is entitled to recover pre-judgment interest." *See* ECF No. 430. In the meantime, the defendant filed a "renewed" post-verdict motion under Rule 50(b).

On February 15, 2023, the Court issued an opinion denying the defendant's renewed motion for judgment as a matter of law and declining the plaintiff's request for a discretionary award of pre-judgment interest. The parties subsequently filed the pending motions.

## II.

Citing Civil Rule 59(e), the City argues that it is entitled to "offsets" against the judgment to account for: (1) payments received by HRT from third parties for sale of "fixtures" and "scrap" removed from the property after the date of the taking on January 1, 2009, and (2) "rents" allegedly accrued to HRT's principal Karl Thomas under the terms of a judgment obtained by Thomas's other entity, Merkur Steel, Inc., which obtained a state court judgment against the City for the taking of its leasehold interest as a tenant of HRT. Those offsets, the City contends, would exceed the amount of the jury's verdict at the second trial.

Under Federal Rule of Civil Procedure 59(e), the Court may grant a motion to amend or alter a judgment if there is "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005) (citing *GenCorp, Inc. v. Am. Int'l Underwriters*,

178 F.3d 804, 834 (6th Cir. 1999)).  A Rule 59(e) motion is not properly used, however, "to raise

new legal arguments that could have been raised before a judgment was issued," or to re-hash old

arguments.  *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*, 477 F.3d 383, 395 (6th Cir.

2007) (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir.

1998) (stating that "[a] motion under Rule 59(e) is not an opportunity to re-argue a case")); *FDIC

v. World Univ., Inc.*, 978 F.2d 10, 16 (1st Cir. 1992) (explaining that a Rule 59(e) motion "may

not be used to argue a new legal theory").

    As the defendant points out, other federal courts have found that the question of offset

against a judgment properly is presented in a motion under Rule 59(e), *e.g.*, *Tweedle v. State Farm

Fire & Cas. Co.*, 527 F.3d 664, 673 (8th Cir. 2008); *Gilliam v. Allen*, 62 F.4th 829, 847 (4th Cir.

2023), and the Court advised the parties that it would reserve the question for decision after the

verdict was returned.   However, the defendant's demands for "offset" of amounts allegedly

received by the plaintiff after the date of the taking on January 1, 2009 are in some respects

unsubstantiated by the record and in all respects unsound as a matter of law.  Moreover, the leading

case cited by the defendant actually is adverse to its position.

    First, the City's demand to "offset" amounts allegedly received by HRT for sale of

"fixtures" is frivolous where the jury's verdict explicitly awarded HRT $0 for the value of fixtures.

The defendant contends that just compensation "necessarily includes" the value of fixtures

attached to land, and the jury was instructed that the definition of "market value" includes the

value of "fixtures," as they are defined under Michigan law.  Trial Tr. Vol. III, ECF No. 435,

PageID.11734 ("The market value of the property includes the value of its fixtures.").  However,

after counsel presented extensive oral argument about the definition of fixtures in the context of

the jury instructions, the Court indicated that it would submit a verdict form that allowed the jury

to isolate a separate compensation award for fixtures. *Id.* at PageID.11777 ("I think it's probably wise to alter the verdict form. It hasn't gone back to them yet. But to identify the value of the land and buildings and then fixtures separately and then a total."). When it returned its verdict, the jury separately indicated its valuation of the "land and buildings" as $1,976,820 and its valuation of "fixtures" as $0, with a "total" compensation awarded of $1,976,820. There is simply no legal ground for reduction or "offset" of compensation based on the value of "fixtures" where the compensation adjudged by the jury explicitly excluded the value of any fixtures and compensated the plaintiff for the value of the "land and buildings" only.

The City points to Karl Thomas's trial testimony that the value of the fixtures on the date of taking — January 1, 2009 — was over $2 million, and that later Thomas sold the fixtures after a demolition crew presumably removed them from the property. The jury properly considered this testimony during its deliberations. There are two ways, perhaps, to look at its resulting verdict: that the jury believed that the value of the fixtures in place on the taking date was $0, or that the jury concluded that HRT already was compensated for the fixtures' value after the demolition crew did its work and therefore was entitled to no more. Either way, that value was accounted for in the verdict, and there is no basis to set off the City's own calculation of the value of the fixtures against the jury's separate determination of the value of the land and buildings alone.

Second, the City contends that proceeds from the sale of "scrap" from demolished buildings must be credited toward its judgment. That demand, however, is barred by Michigan's common law collateral source rule, which prohibits a tort defendant from receiving a windfall reduction of its judgment based on payments made to the plaintiff by third parties.

Under Michigan law, "'[t]he common-law collateral-source rule provides that the recovery of damages from a tortfeasor is not reduced by the plaintiff's receipt of money in compensation

for his injuries from other sources.'" *Ilnytskyy v. Equipnet, Inc.*, No. 19-12268, 2022 WL 4396963, at *3 (E.D. Mich. Sept. 23, 2022) (quoting *Tebo v. Havlik*, 418 Mich. 350, 366, 343 N.W.2d 181, 186 (1984)). "'In the context of insurance, the rationale for the rule is that the plaintiff has given up consideration and is entitled to the contractual benefits. The plaintiff's foresight and financial sacrifice should not inure to the benefit of the tortfeasor, who has contributed nothing to the plaintiff's insurance coverage.'" *Ibid.* "'Similarly, gratuitous compensation should not inure to the benefit of the tortfeasor. The tortfeasor has contributed nothing, except the activity which caused the plaintiff's injuries.'" *Ibid.*

The City relies heavily on *Roundhouse v. Owens-Illinois, Inc.*, 604 F.2d 990 (6th Cir. 1979), to support its argument. However, the court in that case actually *reversed* the district court's judgment that included an offset for payments made to the plaintiff by a non-party. In that case, the defendant — a private party vendor of diseased trout — argued for an offset of the judgment for funds paid to the plaintiff trout farm operator by the State of Michigan, after the State had ordered the sick fish to be destroyed. As the Sixth Circuit explained:

> What matters is whether the source of the funds is independent of (collateral to) the wrongdoer. The district court reasoned that the state of Michigan was so involved in the destruction of the fish that it could not be viewed as playing a "collateral" role. Although this view is plausible, we think it crucial that the state was not a party to this action, nor aligned with a party to this action. In fact, the defendant argued at trial that Michigan's action in ordering the fish destroyed was an unforeseen intervening cause for plaintiffs' losses. In sum, we think that the rationale of the collateral source rule is fully applicable where a wrongdoer cannot benefit from payments to the victim by a third party.

*Roundhouse v. Owens-Illinois, Inc.*, 604 F.2d 990, 994-95 (6th Cir. 1979).

In this case, just as in *Roundhouse*, it is undisputed that any alleged buyers of "scrap" or other items of value removed from the parcel all are non-parties with no relation to the City of Detroit. The collateral source rule bars the offset of any amounts paid to HRT by those third parties. The City attempts in its presentation to impute some wrongdoing to HRT through the

alleged "extraction of value," which it says occurred between 2009 and 2013.  But there is no legal or factual basis for any finding of trespass to the City's rights in the property, since the City did nothing to take control or possession of the property — doggedly resisting doing so — and HRT was the record owner of the parcel even after the determined date of the taking, until a partial judgment entered by Judge Cohn in 2018 judicially transferred legal title to the City.  *See* Partial Judgment Transferring Title of Property to Defendant, ECF No. 162 (Mar. 2, 2018).

Third, the City argues that it is entitled to an offset for payments of "rent" that the City was obligated to make to non-party judgment creditor Merkur Steel, Inc. under the terms of the state court judgment that compensated Merkur Steel for the taking of is leasehold interest.  When the Court ruled on HRT's motion *in limine* to exclude evidence of "rents paid to tenants," HRT conceded that it had abandoned any claim for "lost rents" from tenants of the property, and the Court held that any such rent payments had nothing to do with the claims in this case.  Hr'g Tr., ECF No. 421, PageID.11603 ("There was a lawsuit by Merkur Steel, which was a tenant, and there was a lawsuit by Steel Associates, Inc., which was a subtenant. They both got judgments against the City for the interference with their leasehold interest.  Those prior lawsuits did not involve HRT and did not involve the transfer of the real estate, including the land, the building, or the fixtures to the City.  HRT received nothing from those.").  The City has cited no legal authority for its position that it is entitled to an "offset" in this case for payments that it was obligated to make under a judgment imposed in a separate proceeding, brought by a distinct entity, based on claims for deprivation of separate property interests (i.e., the taking of a leaseholder in the separate litigation as opposed to the landholder in this case).

The City seems to believe that it is entitled to credit due to its allegations that Merkur Steel and HRT both are owned wholly or partly by non-party principal Karl Thomas.  However, it has

not provided any actual evidence of either an identity-in-fact of the corporate entities or of the extent, if any, of any common ownership. The only document submitted into the record merely indicates that sometime in 2006, Merkur Steel, Inc., a Michigan corporation, was merged along with another corporation (City Steel Processing, Inc.) into a single surviving entity, T&T Management, Inc. (a Florida corporation). *See* Articles of Merger, ECF No. 453-8, PageID.12084. Karl Thomas executed the articles of merger as President of both Merkur Steel and City Steel. *Id.* at 12085. But the records make no mention of HRT, and there has been no evidence presented to substantiate the defendant's speculative claim that "T&T Management, Inc. . . . might also own HRT." Def.'s Mot., ECF No. 453, PageID.11975.

The City is not entitled to "offset" any amounts that it was obligated to pay to any third-party as a judgment debtor in separate litigation, and any payments allegedly received by the plaintiff from third parties are precluded from offset against the judgment under the collateral source rule. The defendant's motion to alter or amend the judgment will be denied.

III.

The Court previously denied HRT's motion for an award of prejudgment interest. HRT seeks reconsideration and again asks the Court to award prejudgment interest at an annual rate of 8%, compounded quarterly, which it says is necessary to compensate the plaintiff for the loss of use of the property value from the date of take on January 1, 2009 through the entry of judgment — a period of more than 14 years. HRT maintains that the Court made a mistake when it relied on out-of-circuit precedent to conclude that the question of prejudgment interest should have been presented to the jury. And it says that the ruling contradicted earlier rulings by Judge Cohn and was inconsistent with the final pretrial order entered before the latest trial. The City, of course, disagrees.

-14-

Under our local rules, motions for reconsideration "are disfavored," and they may be brought only if the Court made an outcome-determinative mistake, the controlling law since has changed, or new facts were discovered.  E.D. Mich. LR 7.1(h)(2).  HRT relies on the first ground.  And it has shown that reconsideration is warranted here because it has identified palpable defects in the prior ruling, based on its justifiable reliance on in-circuit precedent holding that computation of prejudgment interest properly may be performed by the Court after the jury has determined a fair market value for the property, and based on indications in the record that the question of prejudgment interest previously was regarded by the Court as determinable after trial.

The most persuasive basis for reconsideration is the fact that in Judge Cohn's decision on remittitur and other post-verdict issues following the first trial, he called out that the computation of prejudgment interest was "premature" in light of his ruling on the remittitur.  That ruling plainly indicates that Judge Cohn contemplated the calculation of prejudgment interest by the Court at an appropriate time after the determination of the property value by a jury.  *See* Decision on Remittitur, ECF No. 315, PageID.9479 ("Proceedings on the motion for prejudgment interest and attorney fees are **STAYED** pending further order of the Court. These motions are premature in light of the Court's ruling.").  HRT's argument that it was blindsided by the City's post-trial challenge to the award of prejudgment interest is well taken because HRT certainly was justified in relying on the prior indications by the Court that the Court intended to compute that element of compensation after the verdict was returned.  The City has not pointed to anything in the record showing that it previously brought the question squarely before the Court or made any attempt to challenge the award of interest on procedural grounds until its supplemental brief was filed after the second verdict was received.  Under the circumstances, HRT understandably was aggrieved by the denial of prejudgment interest after the second trial.

-15-

The City does not dispute the general principle that prejudgment interest may be required as a component of "just compensation" for a governmental taking of property when the interval between the taking and payment of the compensation due is substantial.  In this case, the date of the taking was fixed by the jury's verdict in the first trial as January 1, 2009.  Judgment was entered on February 13, 2023, and an amended judgment will be entered after today, more than 14 years after the taking.  The City argues that HRT is precluded from seeking a post-verdict award of prejudgment interest from the Court because it did not request jury instructions on prejudgment interest and made no presentation to the jury in the second trial to establish a reasonable interest rate or any component of interest as part of its damages case.

The Court initially agreed with that argument.  As the City pointed out, the courts of appeals in other circuits have in some cases held that the determination of a "reasonable interest rate" for computation of prejudgment interest is a question of fact for determination by the jury, and that a district court has discretion to deny a post-verdict motion for an award of prejudgment interest where the plaintiff did not ask the jury to determine an award of prejudgment interest.  *E.g.*, *Tony Guiffre Distrib. Co. v. Washington Metro. Area Transit Auth.*, 740 F.2d 295, 298 (4th Cir. 1984) ("Interest, as an element of just compensation, ordinarily should be determined by the trier of fact. When a landowner does not ask the trier of fact to consider interest, the court may determine that he is precluded from making the claim."); *United States v. 50 Acres of Land*, 706 F.2d 1356, 1364 (5th Cir. 1983), *rev'd on other grounds*, 469 U.S. 24 (1984) ("Since the proper interest rate is an element of 'just compensation,' we consider the determination of that rate to be within the province of the jury as finder of fact."); *Kolb v. Goldring, Inc.*, 694 F.2d 869, 875 (1st Cir. 1982) ("[P]laintiff did not request prejudgment interest from the jury. He was therefore barred from subsequently seeking it from the judge."); *United States v. 100 Acres of Land*, 468 F.2d 1261, 1269 (9th Cir.

-16-

1972) ("This court is of the opinion that interest, at a proper and reasonable rate, is an element of the just compensation to be determined in the judicial process. Since we believe interest is an element of just compensation, we must consider whether interest is a question of law to be decided by the court, or if it is a question of fact to be determined by the trier of fact. In a complex capitalist society such as ours, a determination as to what is a proper rate of interest has many variables based on economic and business considerations which may vary within each factual situation. It seems clear that a determination as to the proper rate of interest is a factual question and should be determined by the trier of fact.") (cleaned up).

The parties have not cited any Sixth Circuit case squarely confronting the question whether a plaintiff in a taking case is *precluded* from making a post-verdict request for prejudgment interest where it made no presentation to the jury to establish an appropriate rate of interest for such an award. But the Sixth Circuit has held, in a somewhat similar context, that the district court in a Title VII case did not abuse its discretion by denying a plaintiff's demand for prejudgment interest, where no demand for interest was included in the plaintiff's damage calculation. *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 909 (6th Cir. 1991) ("Scales next contends that the district court erred in denying her pre-judgment interest on her damage award. The award or denial of pre-judgment interest is within the sound discretion of the trial judge. Because Scales did not request any prejudgment interest in her damage calculation, we find no abuse of discretion in this case.").

*Scales*, however, is not quite on point. The City erroneously contends that HRT "never requested" prejudgment interest. But in its complaint, HRT expressly prayed for "interest as allowed by law." *See* Compl. ¶ 135, ECF No. 1, PageID.23 ("Count III, Inverse Condemnation — Regulatory Taking," praying that the Court "Award HRT its costs, interest and attorney's fees as allowed by law"). And the demand for prejudgment interest expressly was incorporated in the

joint final pretrial order.  Joint Final Pretrial Order, ECF No. 422, PageID.11082 ("Damages. Plaintiff seeks to recover the following: A. Just compensation for the property taken by the City, with the amount to be determined by the jury at trial. B. Attorney's fees it has incurred in this matter and pre-judgment and post-judgment interest.").

Notwithstanding the noncontrolling decisions from other circuits noted above, in other decisions more precisely on point, the Sixth Circuit has approved of the procedure whereby a district court calculates an award of prejudgment interest to be added to a jury's determined valuation of property subjected to taking.  *E.g.*, *United States v. Certain Land Situated in the City of Detroit, Wayne Cnty.*, 450 F.3d 205, 211-12 (6th Cir. 2006) ("In an opinion published after trial and briefing by the parties, the district court calculated the interest owed to DIBCO by the government based upon the Declaration of Taking Act, 40 U.S.C. § 258a (re-codified as 40 U.S.C. § 3114). Because the determination of a reasonable rate of interest for just compensation is a finding of fact, our review is for clear error.").

The City contends that such a procedure would constitute a "modification" of the jury's verdict, but it is well settled that there is generally no prohibition on the determination by the Court of a monetary award arising from equity rather than by law.  "The Constitution creates a right to a jury for legal remedies, but not for equitable remedies."  *Navarro v. Procter & Gamble Co.*, 529 F. Supp. 3d 742, 751 (S.D. Ohio 2021).  Thus, it has been held that an assessment of profits for disgorgement in a copyright case constitutes an equitable and not a legal remedy, and the Seventh Amendment does not require a determination of the amount of profits by a jury.  *Id.* at 754 ("On the historical record, there is simply no question that the ancient remedies of accounting, constructive trust, and restitution have compelled wrongdoers to 'disgorge'—i.e., account for and surrender—their ill-gotten gains for centuries, and have done so through courts of equity.

-18-

Accordingly, the Seventh Amendment does not provide Navarro a right to a jury trial.") (cleaned up).  Those principles are consistent with the Sixth Circuit's decisions endorsing the computation of prejudgment interest by the Court rather than the jury, where prejudgment interest is awarded on equitable grounds to make the plaintiff whole for the delay in payment of the value of its land over a lengthy interval.

Notwithstanding the nonbinding decisions holding that the Court could in its discretion outright deny the request for prejudgment interest, the controlling case law upholding an award of prejudgment interest calculated by the district court in the taking context weighs against a determination that HRT is barred from recovery of prejudgment interest here.

However, the calculation of an appropriate rate and amount of interest are another matter. HRT's presentation on this point is thin and consists only of sparse reports of the returns achieved by several stock investment funds over the period in question.  HRT proposes a rate of 8% interest, compounded quarterly, but it has not made any robust presentation to demonstrate that 8% is a rate of return that a "reasonably prudent investor" might have achieved during the relevant time period, nor has it cited any legal authority for its proposition that quarterly compounding is essential to make the plaintiff whole on its taking claim.  Moreover, it is not clear from the record that fairness and equity require that the plaintiff recover prejudgment interest for the entire period from 2009 through 2023.

The City points out — accurately — that HRT's principal has admitted that HRT was "largely" in control of the property from 2008 through at least 2015.  Karl Thomas so testified. Trial Tr. Vol. III, ECF No. 435, PageID.11699.  Title to the property formally was transferred to the City via a "partial judgment" entered by Judge Cohn on March 2, 2018.  During the first trial, Thomas also admitted that in 2013 he hired a company to demolish one of the factory buildings

on the site due to "structural problems" that resulted when scrappers removed many of the structural steel beams.  Trial Tr. (1st) Vol II, ECF No. 273, PageID.8132-33.  Another building was demolished in 2012 by persons unknown to Mr. Thomas, but the office building on the site remained standing at the time of the first trial in 2018.  *Id.* at PageID.8130, 8132.  The City insinuates that HRT profited by the demolition of buildings on the property, but it has not cited any evidence in the record substantiating the proceeds of those activities.  Nevertheless, it appears to be undisputed that HRT nominally exercised at least some dominion over the property during a substantial portion of the 14-year period in question.

It is noteworthy also that a substantial part of the delay in recovery in this case is attributable to HRT's decision to reject the remittitur by Judge Cohn, which reduced the first jury verdict to $2 million, thereby incurring the need for a second trial, with all of the ensuing delay that was associated with that proceeding.  At the second trial, HRT secured a verdict that was notably *less than* the reduced verdict from the first trial.  Therefore, at least several years of the period of delay fairly is attributable to HRT's decision to reject the result of the first trial and insist on redetermination by a second jury, resulting in a lesser verdict.

Other federal courts have found it appropriate to deny prejudgment interest, or to limit the computation period or interest rate applied, to account for substantial delays in the progress of the litigation caused by the plaintiff rather than the defendant.  *E.g.*, *DC Plastic Prod. Corp. v. Westchester Surplus Lines Ins. Co.*, No. 17-13092, 2022 WL 17129205, at *3 (D.N.J. Nov. 22, 2022) ("[T]he Court understands that several of the delays were caused by health issues of members of Plaintiffs' litigation and management teams. However, these issues do not justify placing the costs of Plaintiff's delays on the Defendant. Accordingly, the Court will deny Plaintiff's requested award of prejudgment interest."); *Kaufman v. Microsoft Corp.*, 34 F.4th 1360,

1374 (Fed. Cir. 2022) ("[B]ecause interest is 'fixed by the court,' a district court has some discretion to decide whether to award prejudgment interest, and 'it may be appropriate to limit prejudgment interest, or perhaps even to deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit.'" (quoting *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656-57 (1983)); *Maersk Line A/S v. Haribo Food 2004, Inc.*, No. 20-20666, 2020 WL 13389300, at *4 (S.D. Fla. July 24, 2020), *R&R adopted*, No. 20-20666, 2020 WL 13389299 (S.D. Fla. Aug. 10, 2020) ("The court has discretion to deny prejudgment interest only when 'peculiar circumstances' make it inequitable for the losing party to pay pre-judgment interest. Such a circumstance includes, for example, a plaintiff's delay in prosecuting a case.") (cleaned up); *Am.'s Collectibles Network, Inc. v. Sterling Com. (Am.), Inc.*, No. 09-143, 2018 WL 11416553, at *2 (E.D. Tenn. Jan. 9, 2018) ("The Court . . . selected the federal postjudgment interest rate to calculate prejudgment interest because equitable considerations — namely, the length of this litigation and delays not attributable to Defendant — merited awarding prejudgment interest at a rate significantly less than the maximum permitted under Tennessee law.").

The case law on point in this circuit has endorsed the procedure whereby a district court calculates prejudgment interest on a determination of the taking value rendered by the jury. *United States v. Certain Land Situated in the City of Detroit, Wayne Cnty.*, 450 F.3d 205, 211-12 (6th Cir. 2006). The City's position that HRT "never requested" prejudgment interest or waived or forfeited any right to such a remedy is not well taken and contradicted by the record. The task before the Court, therefore, is to determine a rate of interest and time period of computation that will fairly compensate the plaintiff for the loss of use of the value of the land during the period in which payment was delayed. The Court must approximate the rate of return that a "reasonably prudent investor" might have realized on the taking proceeds during an appropriate frame of time. *See*

*United States v. 50.50 Acres of Land*, 931 F.2d 1349, 1355 (9th Cir. 1991) ("[I]t is proper, when payment of just compensation is delayed, to fix interest on any deficiency award at the rate a reasonably prudent person investing funds so as to produce a reasonable return while maintaining safety of principal would receive."); *see also Certain Land*, 450 F.3d at 213 ("While it is true that DIBCO would have been better off had the money been tied to different indices over the period in question, there is nothing to suggest that the district court's adoption of the statutorily required rate constituted clear error; in light of the 'reasonably prudent investor' standard, we decline to reverse the district court's decision with respect to interest rates.").

The Sixth Circuit has approved use of the framework and rates for computing post-judgment interest under 28 U.S.C. § 1961 as an appropriate benchmark for awarding prejudgment interest. *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998) ("Because . . . the federal courts need not incorporate state law as the federal common law rule for the applicable prejudgment interest rate, . . . the determination of the prejudgment interest rate within the sound discretion of the district court.  Although a district court may look to state law for guidance in determining the appropriate prejudgment interest rate, we have held previously that the statutory postjudgment framework set forth in 28 U.S.C. § 1961 is a reasonable method for calculating prejudgment interest awards.").  HRT contends that use of the post-judgment interest rate would undercompensate it.  However, taking into account that a substantial portion of the delay in final recovery was attributable to HRT's election to reject the prior (and higher) remitted verdict of the first trial, such a reduction is fair under the circumstances.

Moreover, reduction of the span of computation is appropriate where delay in the proceedings has been due to the plaintiff's conduct and not the defendant's.  In this case, rough justice is best approached by reducing the period of calculation for interest to run from January 1,

2009 through the date of issuance of Judge Cohn's remittitur order on October 30, 2019, excluding the ensuing delay in recovery that was triggered substantially by the plaintiff's rejection of the remittitur.

Although 28 U.S.C. § 1961 provides a workable framework for calculating prejudgment interest, it leaves some questions unanswered. The statute prescribes the method of calculating post-judgment interest, and so it fixes the beginning date as the judgment entry date. It then calls for calculating the average weekly yield rate for 52-week maturity Treasury Bills (i.e., the "1-year constant maturity Treasury yield") during the week preceding the entry of the judgment, which becomes the post-judgment rate going forward until the judgment is paid. 28 U.S.C. § 1961(a). It also calls for compounding interest annually. 28 U.S.C. § 1961(b). The statute does not shed any light on determining a benchmark date for determining a *pre*judgment interest rate, however.

In *Ford*, the court of appeals approved the district court's application of section 1961(a) to calculate a prejudgment interest rate "based on the average 52-week United States Treasury bill rate over the relevant time period." *Ford*, 154 F.3d at 619. The "relevant time period" in this case, however, spans over 14 years, and there are wide swings over that period. For instance, the presently prevailing rate is 5.35%, *see* https://www.casb.uscourts.gov/post-judgment-interest-rates, and the historic rate as of January 1, 2009 was 0.37%, *see* https://www.casb.uscourts.gov/sites/casb/files/historic_rates.pdf. Picking one rate or the other would not yield equitable results for either side. And because the purpose of a prejudgment interest award is to compensate the dispossessed property owner "for the loss of use of money due as damages," *West Virginia v. United States*, 479 U.S. at 311 n.2, and thereby "afford him 'just compensation,'" *Albrecht v. United States*, 329 U.S. at 602, the applicable interest rate should be adjusted to reflect market conditions "over the relevant time period."

To achieve that result here, the benchmark interest rate should be calculated on an average annual basis. The Court will grant in part HRT's motion for reconsideration. Prejudgment interest will be awarded from January 1, 2009 through October 30, 2019. The parties must submit an agreed computation of prejudgment interest based on an interest rate calculated from the average 52-week United States Treasury bill rate for each year from 2009 through 2019. The interest rate samples to be used in calculating the average annual rate shall be the historical published weekly rates for federal post-judgment interest accrual for each year (or partial year) in turn. For example, the average annual rate to be applied for the period starting with January 1, 2009 will be calculated based on the sum of the weekly post-judgment interest rates published from January 1, 2009 through December 31, 2009. The interest accrued for each annual period will be simple interest calculated based on the average annual rate for that period and the principal amount of the judgment. Interest will not be compounded.

IV.

The City has not identified a proper basis to disturb the jury's verdict or to alter or amend the judgment entered in the case. HRT has established that the Court made a mistake when it denied its request for prejudgment interest. It is entitled to an award of interest in an amount to be calculated according to the framework in 28 U.S.C. § 1961.

Accordingly, it is **ORDERED** that the defendant's motion to alter or amend the judgment (ECF No. 453) is **DENIED**.

It is further **ORDERED** that the plaintiff's motion for reconsideration of the order denying prejudgment interest (ECF No. 451) is **GRANTED IN PART**. **On or before September 14, 2023** the parties must submit their joint (or competing) calculation of the amount of prejudgment

interest accrued from January 1, 2009 through October 30, 2019 based on the rate of interest calculated according to the framework set forth above.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   September 1, 2023